Before we begin, I'd just like to welcome Professor Sasser and the students of the College of William & Mary. I guess you're in a senior level, undergraduate level, death penalty course, and you're watching these two cases. As I indicated before we came to court, we'd be happy to come down and share with you any comments, talk with you a little bit about the process after the end of the cases. But welcome, and maybe you'll learn from these astute lawyers. All right, we'll hear first in the case of Lee v. Bevington, Mr. Okole. May it please this Honorable Court, Casey Okole appears for the appellant. This appeal arises out of a civil rights case in which the plaintiff's decedent was shot dead inside his own father's home on July 14, 2010 by the appellee, Todd Bevington, a member of the Richmond SWAT team who fired eight shots in two separate volleys. There is no question, everybody agrees that the shots were fired in two separate volleys. Whether it took 10 seconds, 20 seconds, or was timing. So the best anybody could give would be an estimate. Let me go straight first. Let me start from the back and then go first to the second volley of shots. The reason I go there is because two cases which were relied upon and which were cited to the court were not even discussed by the district court. And that would be the case of Waterman and Batten as well as the Boynton case. The issue when the reason or the defense that the appellee offers is that Mr. Fleming came out of the tear gas infused bathroom and started coming straight at them with hands outstretched, pointing what they believed was a weapon wrapped in a cloth. Officer Wesley Moore fired once and did not fire anymore. He was the first who would be closest to Mr. Fleming, the way they were, he was the shield man. And the second person was Bevington who was shooting across the shoulder of Officer Moore. Mr. Bevington testified that when he fired his first volleys, Mr. Fleming was still running towards them even though the first shot had gone off, which turned out to be the, at the time he said he didn't know, but it was the shot that had been fired by Officer Moore. But Bevington's position was that after that first fire, Mr. Fleming was still running towards them and then he opened fire. After that, Fleming fell. And his testimony is that after Fleming fell, after having sustained these multiple gunshots, he was attempting to get up. And at the same time, whilst attempting to get up, he was still pointing what he believed to be a weapon at him. But that was his testimony three years after the fact. The problem with that testimony is that Mr. Bevington was questioned on the night of this incident by police investigators. He was given the opportunity to tell them what happened. And that was when the events were freshest in his mind. At least one would expect the events to be freshest in his mind. He did not. And this interview was actually videotaped and then transcribed. The transcript is in the appendix, pages 539 to 557. Nowhere in that transcript did Bevington ever suggest or tell police investigators that whilst Mr. Fleming was attempting to get up, Mr. Fleming kept pointing what he believed to be a weapon at them. I submit that had this happened that way, Mr. Fleming, Bevington would certainly have told police investigators that whilst Mr. Fleming was attempting to get up, he kept pointing what he believed to be a weapon at them. So my submission is that it did not happen that way. The reason he didn't tell them on the night of the incident was because at no time was Mr. Fleming pointing anything at him, let alone what looked like a his fellow officers. The only two, by the way, the only two eyewitnesses to the actual shooting were the only two police officers who fired their weapons. Wesley Moore. Officer Moore didn't go in. Bevington was the one that went into the room. Moore stayed back right behind the door there. No, no, no. They both went in. Moore said as they were trained that once they fired, the thing is to move towards the threat. Isn't Bevington go around more and go into the room and actually fire some more shots as he was doing that? No, that was after they got in. He went around. I know where you're referring to. He went around to go into the bathroom to clear the bathroom. But when going in, he did not go across him to fire. He was just shooting across his shoulder. But as Moore, according to Moore, as he moved, those behind him followed. And the next person to him was Bevington. There's no question that when the second volume of shots were fired, they were inside the room where Mr. Fleming had fallen. But the point I want to make is this, is that Bevington did not tell police investigators that as Mr. Fleming was on the floor, lying wounded and attempting to get up, he was able to be pointing a weapon at him because that is the threat that he claimed caused him to continue shooting until, you know, there obviously, when you have many people seeing a very inflammatory explosive situation as this, and they're all looking at it, there are going to be some slight variations. But it seems to me it's undisputed that the officers thought that Lee had a gun and that he had it in his hand, it was pointing in their direction, or regardless, he couldn't see, he still had it out. And that after several shots were fired, he went down and he attempted to get back up, which means now the threat still continued, whether he pointed the gun or held it in his hand. However, and to parse it by tenths of a second, and to say, all of a sudden, the officers felt there was no longer a threat, is a pretty hard case to make. Your Honor, the problem with that is that there's inconsistency in his story. If that was so, why didn't he continue saying he was only trying to get up? The reason, there's a reason... He's done it both times. I think the, even, didn't he say he was trying to get up after, even in his statement after the... Yeah, but he never said he was pointing. At the same time... I understand, but he's got this gun and, you know, if he's got this gun in his hand and he's holding the floor trying to get up, it's the same threat because as soon as he gets up, he's going to lift the gun and fire it. Well, Your Honor, then let me back up because that segues into the first thing I said. I just decided to start with the second volume of shots. We dispute, and based on physical evidence, remember the only eyewitnesses were the police officers simply because when they came in, they cleared the home of the occupant. So there was no other person who was in that house who had the opportunity. Everybody was asked to leave, and then they set up shop within this person's home. And the, nobody disputes that the reason they introduced tear gas was to irritate him, to force him out, and it did the job. And there is testimony by a former team commander, a former SWAT team FBI commander, that's who testified as to the effects of tear gas. And that kind of chemical went introduced into an enclosed place. It makes you to start coughing. Your eyes start burning. Throat starts burning. We do not have the direct testimony of Mr. Fleming as to whether his eyes were burning because he's dead, but at least we know that he started coughing. Everybody testified to that, more testified to that before he came out. He didn't even come out immediately. He stayed there for, depending on who you believe, anywhere between two to seven minutes, and then he came out. And when he came out, they claimed, looking at the angle where they were. First, they were about 14 feet at an angle through a door. If you look at the record, you'll see the door, it's at an angle he didn't know to start with where they were. That's the beginning, because when they came, he was already barricaded. So he did not know where they were. So for him to come out of there and make a sharp left and start running towards them in the room after the hallway, there's a four-feet hallway separating the master bedroom from the room where the swat was staging. And then for him to come out of the master bedroom bathroom, running across the bedroom towards that door to watch them in the other room, seeing them pointing directly at them, because that was their testimony. Their testimony was as soon as he came out, he was pointing directly at us. The way he came out, to be pointing directly at them, he had to turn. Because they were not in his path, he had to turn and turn and know that they were there to be pointing at them and taking them by their words. So given what just happened, the fact that tear gas had just been introduced, it's most unlikely that he would have come out and started pointing something at them. But that's not all. When we look at the physical and the logic of that, he's coming out, he has two choices. He can come out with his hands up or he can come out with his gun. Now, the fact that his aim was perfect doesn't matter. He comes out with a gun. They see him with a gun aimed in their direction generally, which is the only door toward the room. And that's a threat. That's a serious threat. Your Honor, we do respect. I don't quite agree that that is the case. But let me just... What is the case? Whatever the evidence do we have? Well, let us look at this same thing that they claim was a gun. If you look at the... At least what they believe was a gun. You look at the photo, I think it's 310, 312, that's the color photo of that shoe. You do not see one... If you look at this man's hands, they were shot to shreds. He was bleeding like crazy. The autopsy report shows that. Not a speck of blood was on this shoe. This was the same shoe. The shoe closet is inside the bathroom. There were other shoes there, including the second vase. They were in that room. So now, when the people who first got to him, Musselwhite and Hayes, in their statement that evening, none of them mentioned that there was this shoe, that they saw this shoe. It's unlikely that this and none of them, the first people who got on him and handcuffed him, didn't see it. But more importantly, he claimed that it was when these people lifted him up that the shoe unraveled and fell. Now, these people first handcuffed him before lifting him off. So is he suggesting that he was handcuffed, they didn't see the shoe, they didn't see the unraveling, until they lifted him to take him down. Then the shoe unraveled. The story doesn't make sense. The point is that this is not a case for summary judgment. This is a case where things are moving, people are changing their stories. McQuill first said, I handcuffed him. No, we handcuffed him. Then three years after, he puts in a declaration in which he clarified that he only assisted and assisted unnamed, unidentified people in handcuffing him. So we have three stories from this McQuill. The first is he handcuffed him, I. Those are his words. The second was we. And then during the discovery stage, he said he only assisted. So now we have people who are telling stories that don't match up at all, because it's only these two people. All we have are just the physical evidence in the aftermath of the shooting, which is the shoe that the police photographed almost an hour after they arrived. The crime scene unit did not arrive until about an hour after. They were there the whole time. They photographed the outside. They were waiting to go in. It was cleared, and then they waited to go in. But they took, at least the photographer said, he was waiting outside, and then allowed to go in and took pictures. Well, yeah, but before he went in to take pictures already, Bevington had already gone into the bathroom. He testified to that. He went there to clear the bathroom. When he fell, it's clear that they realized that he did not have a gun. And there was sufficient time and motive for Bevington, who knew that this man had no gun. That's what you say in your brief, but there's zero evidence of that. In other words, you say what you're basically saying is the scene was staged by the police officers, that they were corrupt, and they pulled out the towel or the T-shirt and shoe in order to justify their argument. The evidence for that is the fact that the two people who would have seen a shoe and a cloth, the people who put handcuffs on him, did not see that shoe. And that does not square off the testimony that it was when he was lifted up. According to the photograph, which I understand was about an hour later, the T-shirt was full of blood, and the shoe was on the ground next to the wall between the two doors. And the T-shirt was closer to the bed. And what you're suggesting, I guess, is that somebody had to get the blood on the T-shirt and on the towel and go in and get the shoe and lay it out there in the bedroom in order to stage the scene. If you look at that photo, the T-shirt or towel, whatever it was, was in a pool of blood. There was blood on the ground. So it was in that blood. There was blood in the carpet. With blood there, it was on the blood. So the T-shirt was in the same place, in the same place where you have blood on the carpet. That's where the T-shirt was. So how the blood got on it, whether it's from soaking what's there or whatever, I couldn't tell. But it's clear that the T-shirt was there. But coming back to the issue, I still believe... You know what? I hear your story and your argument, and the biggest question I have about it is, while what you say is possible, the problem is there is no evidence to support it. Your argument is essentially that the stories don't match completely. And because they don't match completely, we don't have any story. And so then we can supplant that with any idea that might fit. And that idea would be that this was staged by the police. Your Honor, not necessarily. Dealing with the issue of the second volley of shots, I submit that it's comparable to the case that the judge did not even discuss, which is the Waterman case, that this court has held that what may be a threat at the beginning may cease to be, may be justified at the beginning of an encounter, may no longer be justified seconds after if the threat was no longer there. This, you know... The problem is, I think that I shared Judge Niemeyer's problem with this, is it might be what you've said, but we don't have any witness saying that. And you say that the discordance in the witness's testimony about exactly what evidence leads there, but all it leads to is confusion. In other words, it's the plaintiff, you have the burden of proof, right? And the assertion, what you have to get by on summary judgment is that you have to put up enough evidence to say that it is possible that you'll win. Yeah, we can rely on that evidence as well. What we are relying on is... If they were coming the other way, you have a lot of evidence to rebut whatever it is they're saying. But you have to have affirmative evidence going forward to what you said. Yeah, Your Honor, the affirmative evidence here is the fact that this police officer did not tell the investigators on the night that whilst this man was lying mortally wounded on the ground, he was still pointing a gun at him. But he still had the gun, what he thought was the gun. In other words, the difference in that case, the difference in that and the Waterman case is the threat was still there as long as he's holding the shoe that everybody thought was a gun. And whether he's trying to get up or still moving or whatever, there's still a threat there, according to the witnesses that actually saw. Yeah, but the problem is, one would wonder why would he then shed his testimony three years after? Why doesn't he keep saying, yes, he was only trying to get up? No, three years after, he asked this other piece that because I think he realized that just that the man fell on the floor and trying to get up. We don't know how he was trying to get up, whether he was pushing himself or what. Just trying to get up is not enough to shoot him to death. So he realized that he's certainly he's an intelligent man. He's college trained, and he realized three years after. You mean, let's just change the facts a little bit. Let's say he did have a nine millimeter gun, as they suspected, and he came out with a clearly with a nine millimeter gun. He was shot and fell down. He's about ready to get up. The gun's still in his hand. It's not aimed at him. It's still in his hand. That's as much of a threat as if it was pointing at him. That is the relevance of coming into the room. They were already close to him, close enough to be able to either jump him, kick him or do something else. Remember, this man had sustained pretty quick, you know, and when somebody has a gun, it just takes a squeeze of the trigger. Well, the hands were shot to shreds. I mean, that's the hand. So they're going to make the assessment that they're they've fired guns. He's goes down. He starts to get back up. They're going to say, well, are his hands damaged enough? Does he still have his hands on the trigger? He's getting up. He's got a gun. And so they fire to get him back down. And I mean, this is pretty hard stuff. I submit that there's a reason why it's moving. Very quick moving. I agree. It was moving, but it was not moving enough for Wesley Moore to realize. He may say that he was trying to protect his team people. The thing is that when he fired at him and saw him falling down, he realized that he wasn't he wasn't a threat to them. And that was why, even though he was number one, they were pretty sure he had a gun. There was some suspicion that he'd committed a murder that morning. They said they thought he had a gun. He threatened that he was going to shoot somebody. He said, I'm going to come out fighting. And so the whole stage is very tense. They're trying to negotiate with them. They're trying to get him out. They finally throw the tear gas in to get him out. And he comes out like this, wrapped with this heel of a shoe. Looks exactly like a nine millimeter. And as you say, tear gas is around. So there's a blurry situation, fast moving. And Moore fires a shot. Of course, Bevington thinks that's your man firing the shot. And he fires a shot. This is all quick moving stuff. And you want to, I guess, hold these the father did tell them at this point that one, he did not have a gun to there was no gun at all in his home. The father who owned the home told officers that's unfair evidence at this point, isn't it? Based on what they had information they had. Well, depending on who's given the information, these are what contradicts it. They had a warrant for armed robbery. They said he he may have a nine millimeter gun. They said they thought he was involved in a homicide that morning. He had actually threatened the officers. He said he will not surrender without a fight. He asserted that he had a gun in his belt. Somebody thought he had a gun in his belt from what they could see. And then he emerged with this heel of a shoe wrapped in his arm, posturing as if he had a gun. He didn't come in like this. He came out like this. The heel of his shoe that we now see doesn't have anything to indicate he had it in his hand. No blood, nothing whatsoever on this shoe. He's not going to bleed. I don't think so from his bleeding. Well, we don't know for sure. No, no, no, no, no, no, no, no, no, no, no, no. No bullet holes, no blood for a hand that was bleeding that much on this shoe. Do we know his hand was bleeding or was it his body? Oh, his hand. The autopsy report shows that you couldn't even look at the color photos of the hand. The hands were badly shredded, both from gunshot wounds. I see your red lights on. You do have a rebuttal. We'll see you back. No, that's all right. Mr. Beck. Thank you. May it please the Court, Cameron Beck on behalf of Todd Bevington. Your Honor, we ask the Court to affirm the District Court's order entering summary judgment to Detective Todd Bevington on the grounds he did not violate Mr. Fleming's Fourth Amendment rights and that Detective Bevington is entitled to qualified immunity. Your Honors, I will first in this fact some circumstances known to Detective Bevington leading up to when this incident and the shooting occurred. Then second, address the appellant's claim that the District Court made incorrect conclusions and erroneously found that it was unreasonable for Detective Bevington to believe that Mr. Fleming was a threat. And also the appellant's claim that in fact the officers, including Detective Bevington, staged the scene in this incident. Taken all together, the evidence shows that none of the material facts are in dispute. First, as we were dealing with a Fourth Amendment situation, it is important to consider the facts and circumstances known to Detective Bevington leading up to this incident. Back on July 14, 2010, he was called out to this barricade situation as part of a SWAT team. And when he arrived on scene, he was briefed by his Detective Bevington had already known about Mr. Fleming and known through some information back at the police station that he was had threatened to not go down peacefully and that he would shoot it out with police. Not just this particular situation, but just in general. Lieutenant Tovar advised Detective Bevington that there was a warrant for the arrest of Mr. Fleming for robbery, that he was suspected in a homicide earlier that day, that Fleming had said that he was going to unlikely to surrender. Also, Lieutenant Tovar showed Detective Bevington a wanted poster that we have in our appendix that contains similar information. It was with this information that Detective Bevington went up into the second floor of this residence and there gathered with six other SWAT team officers. And it's important, as the appellant mentioned in this case, a distance of 14 feet. Where these officers staged, there was Officer Moore in front, Detective Bevington behind him, then five officers behind him in a stack. And from Officer Moore to the bathroom door where Fleming eventually came out was less than 14 feet. We're dealing with a very confined area. Was Moore in the hallway or in the room? We were dealing with two bedrooms. The master bedroom, which had a bathroom off it, which is where Fleming was barricaded. And then across the hallway, the hallway was approximately three and a half feet, there was a second bedroom. And Moore was positioned in the threshold of that second bedroom door with Bevington immediately behind him. While on the second floor of this house over a period of hours, there was a negotiations team that was dealing directly with Mr. Fleming and learned certain information from him through a phone and video through that phone that was relayed to Detective Bevington. And Detective Bevington was told that Fleming appeared to have a gun and that Fleming claimed to have a gun and that this gun could be seen on video. It appeared to be in his waistband. And earlier as when Detective Bevington come into the house, he'd been told that Fleming was known to have a nine millimeter, nine millimeter handgun. Also, the negotiators relayed that Fleming was threatening to come out with his junk, which Bevington took to mean a gun. And that Fleming was threatening Bevington and the other officers. In addition to this information, during the time, the several hour period the standoff was occurring, Bevington was yelling back and forth to Fleming. And Fleming was saying, you guys are going to have to come in and get me. I'm going to shoot it out. What are you going to do if I come out with my junk? And Bevington repeatedly advised Fleming to come out with his hands up, instructed him how to surrender repeatedly. And in addition... Is there evidence as to how the officers interpreted junk? Yes. Both Bevington and Moore have testified in their depositions that they understood junk to mean a gun. And there's also a word SHIT used by Mr. Fleming as well. And both of them understood that to be slang for a gun as well. And so not only had Bevington been told by Tovar that he was believed to be armed, and by the negotiators, Fleming himself was saying, giving them certainly an impression, that he had a gun and that he intended to shoot it out with the police. And it was with all this information that Bevington had, and the other officers, in this situation, the electricity was turned off by the superior officers. And so you're dealing with a very tight area, high stress, very intense atmosphere. And a decision by a superior officer was made to inject two canisters of tear gas in. They throw that through the window? Yes, they shot it through the window, yes. And the SWAT team had been advised of this, they put on their gas masks. And shortly after that tear gas was injected into the bathroom, Mr. Fleming came out. And it is starting here that the appellant in this case makes issues of what he contends are factual issues or reasons why summary judgment should be denied. And as I'll explain to the court, none of these issues are facts, are dispute, are material facts in dispute, and that summary judgment should have been and should be upheld by this court. And as the court previously was discussing with the appellant, Fleming came out of the bathroom quickly, moving towards the officers, out of this bathroom door, less than 14 feet away. And when he did so, both Moore and Bevington, who given the viewpoint of the officers, were the only two officers that could actually see Fleming come out of the door. They both testified that Mr. Fleming came out with both hands pointed out in front of him, clasped together. And he was holding what appeared to be a cloth, light colored cloth or t-shirt. And in it was a black object that Detective Bevington has testified that it in fact appeared to be a nine millimeter handgun. And based on this, this threat that both Moore and Bevington perceived, perceived, Moore fired the initial shot. And as the deposition testimony explains, the record explains this case, Bevington paused just a split moment because the shot by Moore caused the shield that Moore was holding in front to knock up his gun. Bevington observed Fleming continuing to come at him and fired multiple shots. And it was a total of eight shots. Here there is a difference in the record in terms of Bevington's position that is addressed in the appellant's brief. And the question is whether Bevington shot, fired his shots from the second bedroom threshold where he was staged and where he recalls not moving while he was firing versus whether he moved forward while he was shooting and shot at least one of his shots inside the threshold of the master bedroom. Viewing the evidence in the light most favorable of the plaintiff as we must do at this stage, the evidence would be that Bevington was inside the threshold of the master bedroom door because that's what Moore recalls and there's also an expert in this case, Nodell, who provides that testimony. Even assuming that to be the fact, it does not change the threat that existed to Bevington and his fellow officers at that time. During this entire time that Moore was firing and Bevington was firing, they both observed this black object, which they believed to be a gun that the plaintiff was pointing at them as he approached them. And whether Bevington was four or five feet forward inside the threshold of the master bedroom or in the second bedroom is irrelevant, is not a material fact that would preclude summary judgment in this case. And it's important that in the appellant's brief he states that that is the whether he's in the master bedroom or in the second bedroom. Either way, Fleming is posing a threat. The appellant also states there's compelling evidence that Fleming is not advancing. There's absolutely no evidence that Fleming was not advancing. The only evidence is that he had a gun and was advancing towards the officers. The other issue which the appellant addressed in his argument is the position of Fleming at the time and him holding this weapon at the time that the shooting occurred. There is evidence from officer Detective Bevington that he fired at Fleming and then he went down and then he fired a second volley of shots, which when asked what the difference in the volley of shots, he says a half second. It's a very small period of time. And in fact, Moore himself doesn't even recall there being two different volleys of shots. He just recalls one volley of shots after he fires his initial shot. And Bevington's testimony and Moore's too is that when Fleming was on the ground, he not only had what they believed to be a gun, it was pointing at them. And Bevington fired until that threat was gone. Was the evidence and the testimony consistent that when Fleming came out of the bathroom, he had what appeared to be a gun in his hand? Yes. He had this wrapped with the barrel. Both Moore and Bevington testified to that? Yes. Yes, Your Honor. So if that is so, then it's hard to support a theory that the cloth and the shoe were staged by the police after the fact, because both officers consistently state that he had what appeared to be a gun when he came out of the bathroom. Correct. And they continue to see this when Mr. Fleming went to the ground and when he had the black object, the barrel. It doesn't matter. It has to be somewhere. I mean, the fact of the matter, the argument is that it was staged as opposed to being used by Fleming. And if the evidence is consistent that he came out with what appeared to be a gun, which was the wrapped heel of the shoe, then it sort of undermines any notion that later Bevington went into the bathroom and got a shoe and threw it in the bedroom and got a cloth and threw it in the bedroom and got blood on it. Correct. And in fact, there were multiple other officers that after the incident, Moore saw the shoe in the master bedroom. Officer McQuail testified that he saw a cloth in a shoe in the master bedroom as the SWAT team immediately, immediately after Bevington fired his shots, the SWAT team went in to secure the master bedroom. McQuail, who was behind Bevington, saw the cloth. He saw a shoe. That's in his declaration. We have Officer Musselwhite who sees a cloth or towel next to Mr. Fleming in this case. Was it a t-shirt or a towel? Well, it turns out to be a t-shirt, a bloody t-shirt. But as they're rushing into the room, it is described by Officer Musselwhite, I believe. He thinks it's a towel. But whatever, it's the piece of material that we see in the pictures and it's the only one. At the very beginning of your argument, you talked about some information that the defendant was told or a picture he was shown and you said it's in the record, you know, about this whole incident. There should, he was told, I believe the court's referring to the wanted poster that he was. Yes. Where is that? You said it was somewhere. I believe it's in our joint appendix in the record. It is a wanted poster that Lieutenant Tovar had that Bevington testified that he saw. And I believe there's a picture of it. I can't give the court a cite to that at this point in time. Okay. The, and so in terms of the, one of the other appellant's points in terms of whether there was a shoe or a cloth, there's also, there's abundant evidence that in fact there was a, this t-shirt and the shoe immediately after, as the officers came in there. And that is what officer Blackwell and another officer of one of the seven officers testified to seeing the t-shirt and the shoe in the room right after the incident. The plaintiff, the appellant in this case relies heavily on the fact that one officer who was arresting officer Hayes, who was arresting Mr. Fleming said that he doesn't recall seeing a shoe and a towel or t-shirt. He doesn't say it wasn't there. He just, in fact, his testimony is, look, I was more worried on arresting this individual and handcuffing him and getting him to downstairs so he could get some medical attention because they had an ambulance waiting for him. So there's no inconsistent testimony in that regards. As the court has pointed out, there's no evidence of this situation being staged whatsoever. It is complete, I mean, it is even beyond speculation. It's a fanciful theory. That's true. The thing is that all of the only witnesses that could give evidence of that were colleagues of the defendant. Correct. So it's one of those situations where all of the evidence is in the hands of the defendant. And that's what seems to the plaintiff to be an injustice. Well, and maybe it is, but those are the facts. You're correct. Those are the facts and that is the evidence we have. And that is the evidence that both parties brought forth to the district court. It was sort of an incentive when the police, not suggesting that they did in this case, but in a case where they thought that there might be witnesses that would have a different version to get rid of those witnesses. I mean, the only person that could have testified to the contrary is the gentleman that was killed, right? Right. And we must remember, the gentleman that was killed approached the officers, or not approached, was moving quickly towards him with a handgun. Well, that is what they say. And that's the only accounts we have to go to. What we don't know is what he would have said. Well, and we also have the t-shirt afterwards that was found with bullet holes in it and bullet wipe, indicating that, in fact, that's what he was holding at the time he was shot, because he did have bullet wounds in his hands. And so that's consistent with the testimony of Moore and Bevington and the other officers in this case. All right. Anything else? No, sir. All right. Thank you. Mr. Okole. Your Honor, the only point I will make is that there should be a distinction between the first volleys and the second volleys. And my submission is that during the second volley of shots, there was no threat to Bevington to justify the shooting. This is not a summary judgment case. Thank you. Thank you.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Max O. Cogburn Jr.